UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

United States of America,

        v.                                  Crim. No. 2:09-CR-26-1

Michael A. Blow

## REPORT AND RECOMMENDATION
(Doc. 66)

Michael A. Blow, proceeding *pro se*, has filed a motion pursuant to 28 U.S.C. §
2255 seeking to vacate, set aside, or correct a sentence imposed upon him on
December 18, 2009 in the United States District Court for the District of Vermont.  (Doc.
66.)  Following his guilty plea, Blow was convicted of one count of conspiring to
distribute five grams or more of cocaine base, in violation of 21 U.S.C. §§ 846 and
841(b)(1)(B).  (Doc. 49.)  He was sentenced by United States District Judge William K.
Sessions III to 130 months of imprisonment, to be followed by a four-year term of
supervised release.  (*Id.*)  The conviction and sentence were affirmed on appeal (Doc.
61), and Blow is currently serving his term of imprisonment.

Blow now seeks to vacate his sentence on two grounds: (1) the factual basis for
the plea was inadequate because there was insufficient support for the five-gram drug
amount to which he pleaded guilty; and (2) his counsel, Elizabeth Mann, rendered
ineffective assistance during plea negotiations by, among other things, failing to
investigate the case against him and failing to apprise him of the sentencing enhancement

applicable to him as a career offender under the United States Sentencing Guidelines ("USSG").

For the reasons explained below, I recommend that Blow's Motion be DENIED.

## Facts and Procedural Background

**I.       Offense Conduct**

On March 5, 2009, the federal grand jury returned a six-count indictment charging Blow (as well as co-defendant Mason S. Stradford) of: one count of conspiring to distribute five grams or more of cocaine base, one count of possession with the intent to distribute five grams or more of cocaine base, and four counts of knowingly and intentionally distributing cocaine base on four separate occasions in December 2008. (Doc. 1.)  As reflected in the transcripts of the plea and sentencing hearings (Doc. 57; Doc. 58), as well as in the Presentence Investigation Report ("PSIR"), the factual basis for these charges is as follows.

In late 2007, after a tip from a confidential informant, the Burlington Police Department ("BPD") discovered that Blow had been selling crack cocaine out of his apartment in the Old North End of Burlington.  With the help of confidential informants, officers orchestrated four controlled purchases from Blow in October and November 2007.  On December 3, 2007, the BPD executed a search warrant of Blow's apartment. Officers found him alone, without drugs or cash.  They seized four cellular telephones, a cocaine "snort tube," plastic baggies, documents with New York City addresses, and a box of .22 caliber ammunition.  After Blow was cited in state court on four "sale of

cocaine" charges, he pleaded guilty to misdemeanor drug possession and agreed to work for the BPD as an informant.

From late 2007 through 2008, Blow worked with Burlington detectives as a confidential informant.  In late 2008, the BPD discovered that Blow was selling crack cocaine out of his Burlington apartment.  With the help of a confidential informant, the BPD conducted four controlled purchases from Blow on December 9, 11, and 17.  On the evening of December 17, BPD officers executed a state search warrant of Blow's apartment.  Blow and Stradford were present at the apartment.  All the drugs found in the apartment, including more than five grams of crack cocaine, were found on Stradford's person.  (Doc. 57 at 14.)

Both Blow and Stradford made inculpatory statements during execution of the search warrant.  Blow said that he had been operating as a middleman in crack cocaine sales between Stradford and area customers, and that he had made as many as forty sales during the prior month and a half, most in the amount of two grams or less.  Stradford corroborated Blow's statements, claiming that Blow was the Burlington intermediary for a number of New York City crack cocaine dealers.  According to Stradford, Blow had received about five ounces per week from these New York dealers.  Blow, an addict and user himself, would receive small amounts of crack cocaine as payment for his services as a middleman.  Grand jury testimony from other individuals located at the apartment corroborated Blow's involvement in crack cocaine distribution.

## II.     Plea Agreement and Change of Plea Hearing

Blow was arrested on April 14, 2009 and ordered detained because "no condition or combination of conditions of release [could] reasonably assure the safety of any other person and the community." (Doc. 18.) On August 27, 2009, after pleading not guilty at his April 14, 2009 arraignment (Doc. 14), Blow entered a guilty plea to only Count One of the indictment—conspiracy to distribute five grams or more of cocaine base, 21 U.S.C. §§ 846, 841(b)(1)(B). (Doc. 31.) He did so pursuant to a Plea Agreement setting forth the nature of the offense, the consequences of a guilty plea, and the range of possible sentences (a mandatory minimum of five years and a maximum of forty years in prison). (Doc. 30.) The Plea Agreement listed the rights he would be waiving by pleading guilty, and stated that he was "fully satisfied with the representation provided to him by his attorney [Elizabeth Mann]." (*Id*. at 6.)

During the change of plea hearing, Judge Sessions questioned Blow to confirm his understanding of the terms of the Plea Agreement, as required by Fed. R. Crim. P. 11(b). (Doc. 57.) In response, Blow acknowledged under oath that he understood the nature of the offense, including the drug-quantity element, the possible term of imprisonment, including the application of the mandatory minimum term of imprisonment, and the numerous rights he was waiving by entering a guilty plea. (*Id*. at 6-13.) Blow also reaffirmed his satisfaction with the work of Attorney Mann. (*Id*. at 6.) After a recitation of the facts forming the basis of the conspiracy charge (as stated above), Blow confirmed the truth of the allegations. (*Id*. at 15.) Of particular note, Attorney Mann agreed that the government could "certainly prove the facts necessary for conviction." (*Id*.) Blow's plea

4

of guilty was accepted, as Judge Sessions found that the plea was knowingly and voluntarily made, with full knowledge of the maximum and minimum possible sentences. (*Id.* at 15-16.)

### III.    The PSIR and Blow's Sentencing Hearing

In preparation for sentencing, the United States Probation Office prepared a PSIR. In determining the base offense level for calculation of the guideline sentence, the PSIR concluded that Blow's offense conduct involved between 150 and 500 grams of crack cocaine. This quantity calculation was based on statements from confidential informants and statements from witnesses, including Blow's then-girlfriend, that Blow sold crack cocaine from late fall 2007 through late August 2008. According to these sources, Blow had thirty to forty customers per week and typically sold in one-gram quantities. This average quantity was consistent with the controlled buys conducted in 2007 and 2008. The existence of the conspiracy was also established by the post-arrest statements of Blow and Stradford. The PSIR then reduced the offense level for Blow's acceptance of responsibility by entering a guilty plea. Based upon the offense conduct, as well as the adjustment for Blow's acceptance of responsibility, the total offense level was set at twenty-nine. Blow's criminal history placed him in category IV. As a result, absent any

enhancements, Blow's guideline sentence was 121 to 151 months.[1]

Blow's criminal history, however, qualified him for the enhancement as a career offender.[2]  Because the conspiracy charge exposed Blow to a forty-year maximum sentence, *see* 21 U.S.C. § 841(b)(1)(B)(iii) (2009), *amended by* Pub. L. No. 111-220, § 2(a)(2), 124 Stat. 2372 (2010),[3] the career-offender guideline called for an offense level of thirty-four.  USSG §4B1.1(b).  Offset by Blow's acceptance of responsibility, the final offense level for Blow's conduct, as determined by the PSIR, was thirty-one.

---

[1]  Despite the requirement of Fed. R. Crim. P. 32(g) that the PSIR and any addenda be submitted to the court and the parties "[a]t least 7 days before sentencing," here the addendum to the PSIR was submitted only four days before sentencing.  This submission does not amount to "a fundamental defect which inherently results in a complete miscarriage of justice, nor an omission inconsistent with the rudimentary demands of fair procedure," and thus, it is not cognizable on collateral review.  *Hill v. United States*, 368 U.S. 424, 428-29 (1962) ("collateral relief is not available when all that is shown is a failure to comply with the formal requirements of . . . Rule [32]"); *see Basile v. United States*, 999 F.2d 274, 276 (7th Cir. 1993) ("[A] mere technical violation of Rule 32 cannot be corrected in a proceeding under § 2255.").  Blow has not argued, and has thus failed to demonstrate, that the error is one of "constitutional magnitude which had a substantial and injurious effect or influence on [his] guilty plea."  *Schledwitz v. United States*, 169 F.3d 1003, 1011 (6th Cir. 1999) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

[2]  The career-offender enhancement applies when "(1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense."  USSG §4B1.1.  Blow qualified for the enhancement due to a 1993 cocaine distribution conviction in the United States District Court for the District of Vermont and a 2002 aggravated domestic assault conviction in Vermont state court.

[3]  On August 3, 2010, well after Blow's December 18, 2009 sentencing, Congress passed the Fair Sentencing Act of 2010 ("FSA"), which raised the threshold to trigger the five- to forty-year sentencing range from five grams to twenty-eight grams.  *See* FSA at § 2(a)(2) (codified at 21 U.S.C. § 841(b)(1)(B)(iii)).  Today, for amounts under twenty-eight grams, the maximum sentence is twenty years; no mandatory minimum applies.

Prior to the Act's passage, the sentencing provision applicable to the drug offenses alleged here equated one gram of crack cocaine or cocaine base with 100 grams of powder base.  The 100-to-1 ratio, which was enacted in the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 (1986), and incorporated into the sentencing guidelines, reflected the belief that "cocaine base [was] more dangerous to society than [powder] cocaine because of crack's potency, its highly addictive nature, its affordability, and its increasing prevalence."  *United States v. Santana*, 761 F. Supp. 2d 131, 135 (S.D.N.Y. 2011) (quoting *United States v. Buckner*, 894 F.2d 975, 978 (8th Cir. 1990)).  The FSA reduced the 100-to-1 ratio to 18-to-1.

Furthermore, because the career-offender guideline calls for an automatic criminal history category of VI in all cases, *see* USSG §4B1.1(b), the guideline sentencing range 188 to 235 months.  In its sentencing memorandum, the government urged the Court to impose a guideline sentence of 188 months.  (Doc. 46.)

In her sentencing memorandum, Attorney Mann argued for both a downward departure from the sentencing guidelines and a variance based upon the factors at 18 U.S.C. § 3553(a).  Mann also disputed the computation of the guideline sentence in the PSIR based upon: (1) Blow's over-represented criminal history (including his designation as a career offender);[4] (2) the lack of any significant drug addiction treatment; (3) the sentencing disparity between powder and crack cocaine; and (4) the totality of the circumstances (including Blow's low potential for recidivism and strong family ties).  (Doc. 45.)  Attorney Mann sought a non-guideline sentence of eighty-four months.  (*Id*.)

At the December 18, 2009 sentencing hearing, Blow confirmed that he had read the PSIR, that he had reviewed it with counsel, and that the report contained no factual errors.  (Doc. 58 at 2-3.)  Blow did not contest the PSIR's characterization of the quantity of drugs involved in the conspiracy (between 150 and 500 grams of crack cocaine).

In ultimately imposing a 130-month term of imprisonment, Judge Sessions credited many of the arguments made by Attorney Mann.  In particular, Judge Sessions

---

[4]  Mann also argued that Blow's offense level should be adjusted downward to reflect his limited role in the offense conduct.  According to Mann, Blow acted only as a middleman, and never controlled either the quantity of drugs available in Vermont or the money involved.  An addendum to the PSIR stated: "This is a largely moot issue because [Blow] is a Career Offender and the only reduction provided to such individuals" is for their acceptance of responsibility.  Judge Sessions concluded that a role reduction was inappropriate "whether or not the Court applies the career offender" enhancement.  (Doc. 58 at 27.)

noted that, despite Blow's lengthy criminal history, "[t]he only sentence that he received of any substance was in fact the federal sentence in 1993." (Doc. 58 at 28.) The sentence for the aggravated domestic assault—one of the two predicate felonies for the career-offender designation—was "probably . . . time-served" given the approximately 100-day sentence imposed. (*Id*.) Judge Sessions also recognized that Blow had only these two felony convictions on his record, making him "not a classic career offender."[5] (*Id*. at 30.) Overall, Judge Sessions characterized Blow as a "street-level dealer who is driven at least in part by his own addiction." (*Id*.) In light of these mitigating considerations, Judge Sessions adjusted the offense level (which had been increased from twenty-nine to thirty-one after the career-offender enhancement) to twenty-seven, which called for a guideline sentencing range of 130 to 162 months. (*Id*. at 31.) The judge imposed the lowest guideline sentence of 130 months, with four years of supervised release to follow. (*Id*.)

## IV.    Appeal

Blow took a direct appeal of the conviction and sentencing, arguing that the sentence was procedurally and substantively unreasonable because (1) Judge Sessions had allegedly not considered his age in fashioning the sentence, and (2) the 130-month sentence was greater than necessary to serve the purposes of sentencing.[6] In an order dated January 21, 2011, the Second Circuit affirmed the sentence. *See United States v. Blow*, 406 F. App'x 555 (2d Cir. 2011). (Doc. 61.) The Supreme Court denied Blow's

---

[5] Judge Sessions noted, however, that Blow's criminal history made the category VI designation, as called for by the career-offender enhancement, "seems applicable" because Blow "has been in and out of the court system constantly all of his adult life." (Doc. 58 at 29.)

[6] Attorney Michael Desautels represented Blow on appeal. (Doc. 66-7.)

petition for a writ of certiorari on October 3, 2011. *Blow v. United States*, 132 S. Ct. 201 (2011).[7]

## V. The Instant § 2255 Motion

About one year later, on October 10, 2012, Blow, acting *pro se*, moved under 28 U.S.C. § 2255 to vacate the sentence imposed by Judge Sessions. (Doc. 66.) As discussed below, Blow claims there are two bases for his collateral challenge to the sentence.

First, Blow maintains that the plea was invalid because the factual basis proffered by the government consisted of materially inaccurate information. During the change-of-plea hearing, the government indicated that the four controlled purchases resulted in the sale of the following quantities of crack cocaine: 1 gram, 1.5 grams (including packaging), and 4.9 grams (for the last two controlled purchases)—in other words, cumulatively more than the statutorily-prescribed amount of five grams. (Doc. 57 at 14.) But, according to a December 2010 lab report analyzing the quantity of cocaine base actually purchased, the cumulative total for all of the purchases amounted to only 1.446

---

[7] Thereafter, Blow moved *pro se* for retroactive application of the guidelines now applicable to crack cocaine offenses pursuant to the FSA. *See supra* n.4. In light of the amended guidelines, as well as the United States Sentencing Commission's 2011 decision to make the revised sentences retroactive to those sentenced before the Act's passage, *see* Sentencing Commission Release of July 1, 2011 (making Amendment 750, which implemented the 2010 Act, retroactive as of November 1, 2011), Blow requested that the Court reduce his sentence by seventeen months. (Doc. 62.) Judge Sessions denied Blow's motion on the basis that he was not eligible for a reduction in light of his status as a career offender, and that he had, in any event, received a sentence equal to or below any reduction he could receive under the amended guideline provisions. (Doc. 63.) Blow has since moved for reconsideration of this order, and a ruling on this motion is pending. (Doc. 68.)

grams—well below the five-gram threshold necessary to sustain his conviction.[8] (Doc. 66-3.) Because Blow now denies making any inculpatory statements to the police (including the alleged statement that he had made forty sales, mostly in the amount of one gram), he alleges there was no factual foundation for his conspiracy conviction.

Second, Blow argues that his counsel, Attorney Mann, was ineffective for her failure to investigate this factual discrepancy. According to Blow, Mann told him during plea negotiations that the case against him was too strong to risk trial, despite the insufficiency of the evidence against him as to the weight of the contraband. But because Blow claims he did not make the post-arrest statements attributed to him, or alternatively, that he did not receive *Miranda* warnings, he believes his case presented a viable suppression issue, which would have effectively defeated the charges. (Doc. 66-2 at 3.) Blow also alleges that Mann failed to apprise him of the applicability of the career-offender enhancement, and failed to discuss certain stipulated facts with him before the change-of-plea hearing.

The government filed an opposition to Blow's motion (Doc. 69), and Blow filed a reply (Doc. 80). In light of Blow's ineffective-assistance-of-counsel claim, the Court ordered the government to solicit and file an affidavit from Attorney Mann regarding her advice to Blow during plea negotiations. (Doc. 70.) That affidavit has since been filed. (Doc. 73.)

---

[8] No independent explanation for the lab report, which is appended to both Blow's motion (Doc. 66-3) and the government's response (Doc. 69-1), has been provided. This is inconsequential, however, because the parties appear to agree that the amount exchanged in the four controlled purchases totals less than the statutorily-prescribed quantity of five grams. (Doc. 66-1 at 8; Doc. 69 at 8-9.) The amounts described during the plea hearing appear to have been wrong because the government described the amounts sought by the confidential informant during the controlled buy. (Doc. 66-1 at 4; Doc. 69 at 8.)

<u>**Discussion**</u>

### I.  Standard Governing § 2255 Motions

A prisoner in federal custody may file a motion under 28 U.S.C. § 2255 on

grounds that his sentence was imposed in violation of the Constitution or federal laws,

was issued by a court that did not have jurisdiction, was in excess of the lawful

maximum, "or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).  Relief

under § 2255 is therefore generally available "only for a constitutional error, a lack of

jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a

fundamental defect which inherently results in a complete miscarriage of justice.'"

*Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000) (quoting *United States v. Bokun*,

73 F.3d 8, 12 (2d Cir. 1995)).  "The reasons for narrowly limiting the relief permitted

under § 2255—a respect for the finality of criminal sentences, the efficient allocation of

judicial resources, and an aversion to retrying issues years after the underlying events

took place—are 'well known and basic to our adversary system of justice.'"  *Bokun*, 73

F.3d at 12 (quoting *United States v. Addonizio*, 442 U.S. 178, 184 & n.11 (1979)); *see*

*also Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010).

In general, "[u]nless the motion and the files and records of the case conclusively

show that the prisoner is entitled to no relief, the court shall cause notice thereof to be

served upon the United States attorney, grant a prompt hearing thereon, determine the

issues and make findings of fact and conclusions of law with respect thereto."  28 U.S.C.

§ 2255(b) (emphasis added).  This requirement of a hearing, however, does not

necessarily "imply that a movant must always be allowed to appear in a district court for

a *full* hearing. . . . [T]he statute itself recognizes that there are times when allegations of facts outside the record can be fully investigated without requiring the personal presence of the prisoner." *Machibroda v. United States*, 368 U.S. 487, 495 (1962) (emphasis added); *see also* 28 U.S.C. § 2255(c) ("A court may entertain and determine such motion without requiring the production of the prisoner at the hearing."); *Petrucelli v. United States*, Nos. 05 Civ. 9582, 02 Cr. 099, 2009 WL 4858081, at *13 n.1 (S.D.N.Y. Dec. 15, 2009) ("To warrant an evidentiary hearing, a habeas petitioner must raise detailed and controverted issues of fact supported by competent evidence, which, if proved, entitle him to relief."). It is "within the district court's discretion to choose a middle road," without resort to an evidentiary hearing, in adjudicating the merits of a § 2255 motion. *Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001); *see also Pham v. United States*, 317 F.3d 178, 185 (2d Cir. 2003) ("the district court has wide discretion in developing the record it will use to determine a habeas petition"); *Raysor v. United States*, 647 F.3d 491, 494 (2d Cir. 2011); Fed. R. Governing Section 2255 Proceedings 7, 8 (permitting the expansion of the record through submission of documents, exhibits, and affidavits, and leaving to judicial discretion the determination of "whether an evidentiary hearing is warranted"). Here, as in *Chang*, the record has been "supplemented by a detailed affidavit" from counsel "credibly describing" the events that transpired around Blow's decision to plead guilty, *id.* at 85, with supplemental documentary support for counsel's factual assertions.

Because no additional information is needed—and to "avoid[] the delay, the needless expenditure of judicial resources, [and] the burden on trial counsel and the

government" that a full-blown testimonial hearing would cause, *id*. at 86—the current record is sufficient for proper assessment of Blow's motion.[9] *See United States v. Coleman*, No. 1:10-CR-110-2, 2013 WL 708119, at *7-8 (D. Vt. Jan. 24, 2013) (Conroy, Mag. J.) (resolving § 2255 motion alleging ineffective assistance on affidavit submitted by counsel and collecting cases to that effect).

## II.    The Statute of Limitations

The government first argues that Blow's Motion is untimely. Title 28 U.S.C. § 2255(f) establishes a "1-year period of limitation" within which a federal prisoner may file a motion to vacate, set aside, or correct his sentence. Added to the statute by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), *see* Pub. L. No. 104-132, Title I, § 105, 110 Stat. 1220, this limitations period runs from "the latest" of four events:

> (1) the date on which the judgment of conviction becomes final;
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

---

[9] Also, as the Second Circuit held in *Chang*, where the petitioner and his counsel submit conflicting affidavits (as here), "the testimony of [petitioner] and his trial counsel would add little or nothing to the written submissions." *Chang*, 250 F.3d at 86. There, the Second Circuit found this particularly true because the petitioner had relied "solely on his own highly self-serving and improbable assertions," and the petitioner's counsel gave a "detailed description of events [that] was eminently credible." *Id*. The same holds true here.

Sections two through four do not apply here. Blow has not alleged that any governmental action created an impediment to the filing of his motion, nor does he rest his claim on a newly-recognized right. Although the facts supporting Blow's claim are found in the lab report, that report was provided to defense counsel on January 4, 2011, well before Blow's conviction became final (and far outside of the one-year limitations period). (Doc. 69-1 at 1.) As a result, the one-year limitations period began to run from "the date on which the judgment of conviction bec[a]me[] final." 28 U.S.C. § 2255(f)(1).

As interpreted by the United States Supreme Court, a conviction that has been appealed becomes "final" for the purposes of 28 U.S.C. § 2255 "when th[e] [Supreme] Court affirms a conviction on the merits on direct review or *denies a petition for a writ of certiorari*, or when the time for filing a certiorari petition expires." *Clay v. United States*, 537 U.S. 522, 527 (2003) (emphasis added). As such, Blow's conviction became final on October 3, 2011, when the Supreme Court denied his petition for a writ of certiorari. *Blow v. United States*, 132 S. Ct. 201 (2011); *see Coleman v. United States*, 329 F.3d 77, 81 (2d Cir. 2003).[10] The limitations period began to run from this date, and expired one year later, on October 3, 2012. *See Ross v. Artuz*, 150 F.3d 97, 103 (2d Cir. 1998) ("When a statute of limitations is measured in years, the last day for instituting the action is the anniversary date of the start of the limitations period."). Yet this Court did not receive Blow's Motion until October 10, 2012, seven days beyond the statutory window.

---

[10] Blow's pending motion to reduce his sentence does not alter the finality of his conviction. *See* 18 U.S.C. § 3582(b) ("Notwithstanding the fact that a sentence to imprisonment can subsequently be . . . modified pursuant to the provisions of subsection (c) . . . a judgment of conviction that includes such a sentence constitutes a final judgment for all other purposes.").

Under the so-called "Prison Mailbox Rule" a *pro se* prisoner's petition is deemed "filed" at the moment of delivery to prison authorities for forwarding to the district court rather than the moment of receipt by the court. *See Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir. 2001) (applying rule to prisoners filing habeas motions); *Moshier v. United States*, 402 F.3d 116, 117 (2d Cir. 2005) (*per curiam*) (applying rule to motions under § 2255); *see also Houston v. Lack*, 487 U.S. 266 (1988); *Walker v. Jastremski*, 430 F.3d 560, 562 (2d Cir. 2005); Fed. R. App. P. 4(c), 25(a)(2)(C). The rule is justified by the *pro se* prisoner's dependence on the prison mail system and lack of counsel to assure timely filing with the court. *See Houston*, 487 U.S. at 270-71, 274 ("the moment at which *pro se* prisoners necessarily lose control over and contact with their notices of appeal is at delivery to prison authorities, not receipt by the clerk"). This rationale clearly applies to Blow's circumstances—his Motion was drafted without the benefit of counsel and mailed from a correctional facility. Accordingly, if Blow delivered his Motion to prison authorities on or before October 3, 2012, his Motion is timely under the prison mailbox rule even though it was not received by this Court until after that deadline.

Blow's Motion is dated October 1, 2012. (Doc. 66 at 6; Doc. 66-1 at 9.) If this representation is accurate, the Motion was timely filed. But the government maintains in its response that Blow did not file his Motion with prison mailroom officials until four days after that date, on October 5, 2012, which would render it untimely. In support of its claim, the government has submitted a copy of a handwritten mailroom log. (Doc. 69-2.) Because of this disagreement, the issue necessarily becomes who bears the burden to establish the date of filing, and how must they do so.

While other circuit courts have placed the burden squarely on the inmate to establish, by affidavit or declaration, that a timely filing was made under the Prison Mailbox Rule, *see, e.g.*, *Price v. Philpot*, 420 F.3d 1158, 1165 (10th Cir. 2005), the Second Circuit has "never required prisoners to provide affidavits of service to verify when they give their documents to prison officials," *Hardy v. Conway*, 162 F. App'x 61, 62 (2d Cir. 2006). "In the absence of contrary evidence, district courts in this circuit have tended to assume that prisoners' papers were given to prison officials on the date of their signing." *Id.* (collecting cases). The largely illegible handwritten note that the government introduces to prove the date on which Blow filed his Motion, unaccompanied by an affidavit from a mailroom official, does not constitute "contrary evidence."[11] Given the lenient standards applicable to the filings of *pro se* litigants, *see, e.g.*, *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996), I cannot conclude on such ambiguous evidence that Blow's submission was untimely. In reaching this conclusion, I follow the prevailing practice of district courts in this circuit and treat Blow's Motion as having been filed with prison officials on the date it was signed, October 1, 2012—two days before the expiration of the one-year limitations period. Accordingly, I recommend the Court treat Blow's Motion as timely.

---

[11] The government asserts in its response that "officials logging outgoing mail at the FCI-Schuylkill mailroom report that it was on October 5, 2012, when they received from Blow a mailing addressed to this Court." (Doc. 69 at 11.) Instead of providing an affidavit from the mailroom official, the government asserts that it spoke with the corrections official who logged the mail and the Motion was not received until October 5, 2012. (*Id.*) The government has provided no authority that would permit the Court to accept the unsworn statement of an Assistant United States Attorney set forth in a motion response as substantive evidence. Given both the hearsay nature of this statement, and the lack of any foundation in the record other than the illegible mailroom log, I conclude that such evidence cannot be considered in assessing the timeliness of Blow's Motion.

### III. The Merits of Blow's § 2255 Motion

As noted earlier, Blow raises two legally distinct substantive claims in his § 2255 Motion: (1) that his plea is without factual foundation, and (2) that his counsel rendered ineffective assistance during the plea process.

#### A. Adequacy of the Factual Basis for the Plea

Blow maintains that the factual basis for his plea to the conspiracy charge was inadequate because a December 2010 lab report documented that the quantity of cocaine base purchased by confidential informants during the four controlled buys was less than the five-gram amount alleged in the conspiracy count.

Rule 11 of the Federal Rules of Criminal Procedure requires that before accepting a guilty plea a court must "determine that the plea is voluntary . . . [and] that there is a factual basis for the plea." Fed. R. Crim. P. 11(b)(2)-(3). The requirement that there be a factual basis for the plea "does not require that the court be satisfied that a jury would return a verdict of guilty[,] [n]or does it require the court to weigh evidence to assess whether it is even more likely than not that the defendant is guilty." *United States v. Maher*, 108 F.3d 1513, 1524 (2d Cir. 1997). Rather, the court must simply "inform the defendant of, and determine that the defendant understands . . . the nature of each charge," Fed. R. Crim. P. 11(b)(1)(G), and also satisfy itself "that the conduct to which the defendant admits is in fact an offense under the statutory provision under which he is pleading guilty," *United States v. Graziano*, 306 F. App'x 693, 694 (2d Cir. 2009) (quoting *Maher*, 108 F.3d at 1524). "If [the court] decides there was no factual basis for a guilty plea after accepting it, the court should vacate the plea and enter a plea of not

guilty on behalf of the defendant." *United States v. Smith*, 160 F.3d 117, 121 (2d Cir. 1998). To establish the factual basis for the plea, the court "may rely on representations of 'the defendant, of the attorneys for the government and the defense, [or] of the presentence report . . . ,' and indeed may use 'whatever means is appropriate in a specific case.'" *United States v. Culbertson*, 670 F.3d 183, 190 (2d Cir. 2012); *see Irizarry v. United States*, 508 F.2d 960, 967 (2d Cir. 1974) ("It is undeniably true that the district court, in determining whether there was a factual basis for the plea, was free to rely on any facts at its disposal—not just the admissions of the defendant.").

In challenging his plea, Blow contests only the sufficiency of the facts as to the quantity of drugs involved in the conspiracy. Blow is responsible for the activities of his co-conspirators if the evidence reveals that the defendant "knew of his co-conspirator's illicit activities or [that] the activities were reasonably foreseeable by him." *United States v. Jackson*, 335 F.3d 170, 181 (2d Cir. 2003). This includes the quantity of drugs involved if the crime to which the defendant pleads guilty (as is the case here) sets out a specific minimum quantity. The Second Circuit has held that to provide a factual basis for a plea to a drug conspiracy charge, the allocution must establish that the "drug type *and quantity* were at least reasonably foreseeable to the co-conspirator defendant." *United States v. Adams*, 448 F.3d 492, 499 (2d Cir. 2006) (emphasis added). Because drug quantities are elements of aggravated narcotics offenses, *see Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the quantity of drugs involved in an offense "must always be pleaded and proved to a jury or admitted by a defendant to support conviction or sentence on an aggravated offense." *United States v. Gonzalez*, 420 F.3d 111, 131 (2d

Cir. 2005).  Importantly, the quantity of drugs involved "must be sufficiently established *by the record*, rather than by assumptions of fact made by the [plea] judge which may be open to dispute."  *Seiller v. United States*, 544 F.2d 554, 564 (2d Cir. 1975) (citing *Santobello v. New York*, 404 U.S. 257, 261 (1971)) (emphasis added); *see also United States v. Benn*, 437 F. App'x 21, 22 (2d Cir. 2011) ("The factual basis for the offense can be established in a number of ways so long as the relevant facts are on the record or put on the record at the time of the plea.").

In *Gonzalez*, the Second Circuit reversed a conviction by a plea of guilty where the defendant had not agreed to the weight of the substance involved during the plea hearing.  In that case, Gonzalez was charged with conspiring to distribute fifty grams or more of crack cocaine, an amount carrying a twenty-year mandatory minimum sentence. *Id*. at 119.  During the plea hearing, Gonzalez "specifically declined to plead guilty to conspiring to distribute the charged fifty grams or more of crack, explaining . . . that he had never intended to sell the informant a kilogram of real crack," but had intended to sell only a counterfeit substance.  *Id*. at 117.  The Second Circuit held "that Gonzalez's failure to admit—indeed, his explicit challenge to—the statutorily prescribed quantity meant that his plea did not provide the court with an adequate factual basis to enter judgment against him on the charged crime," and remanded to the district court with instructions to vacate the judgment of conviction.  *Id*. at 133-34.  In *Adams*, 448 F.3d at 498, the Second Circuit considered a similar challenge to a plea by a defendant who had agreed that he had participated in a scheme to transport up to ninety pounds of marijuana, but ultimately was convicted of conspiracy to transport five kilograms or more of

cocaine.  Because the district court had "failed to elicit an admission that [the defendant] actually knew he was conspiring to distribute at least five kilograms of cocaine," and because Adams had "insisted that he knew of and agreed to only a marijuana conspiracy," the Second Circuit concluded that there was an insufficient factual basis for the plea.  *Id*. at 499.  The Second Circuit recently reaffirmed these cases.  *See United States v. Culbertson*, 670 F.3d 183 (2d Cir. 2012).

This case is plainly distinguishable from *Gonzalez* and *Adams*.  During the plea hearing, the government described evidence in multiple forms to establish the weight of the cocaine base involved in the conspiracy.  First, the Assistant United States Attorney ("AUSA") recited the amounts from the December 2008 controlled purchases, which, in light of the results from the lab analysis, are now known to be in error and do not exceed five grams.  (Doc. 57 at 14.)  But this evidence represented only a fraction of the evidence of the conspiracy and the drug quantities involved described by the AUSA during the allocution.  The AUSA described the inculpatory statement made by Blow in which he claimed to have engaged in about forty drug sales in the month-and-a-half period, usually in amounts of two grams or less.  (*Id*.)  In other words, Blow admitted to

not only the four disputed sales, but also to forty additional sales.[12]  Furthermore, when the December 17, 2008 search warrant was executed, Blow's co-defendant Stradford was also in possession of more than five grams of cocaine base, a quantity the lab report confirmed.  (*Id*.)  At the plea hearing, the AUSA summarized the facts as follows: "Stradford was the latest in a series of men that were bringing up dope, holding onto it while Blow sold it, and then returned the money."  (*Id*. at 15.)  Upon questioning by Judge Sessions, Blow confirmed that this sequence of events had transpired (*id*.), and also confirmed his understanding that the offense he was pleading guilty to "involved five grams or more of cocaine base."  (*Id*. at 7.)  In his reply to the government's response, Blow describes his role in the alleged conspiracy: "Blow would collect money from addicts who wanted to purchase crack from Stra[d]ford, give the money to Stra[d]ford, then Stra[d]ford gave Blow the crack, which he took to his friends, who like Blow, were addicts."  (Doc. 80 at 11.)

Thus, unlike the defendants in *Gonzalez* and *Adams*, Blow affirmatively admitted to facts that established the weight of the cocaine base at issue as greater than five grams

---

[12]  Blow now denies ever making this statement (and claims that he was also never Mirandized), and says that he informed counsel that he never made the statement during their discussions before the plea hearing.  (Doc. 66-1 at 4.)  But when the AUSA described the statements at the plea hearing, Blow did not deny those statements.  Instead, he confirmed the facts as recited by the government.  "Solemn declarations in open court carry a strong presumption of verity."  *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).  Blow's subsequent denial cannot overturn his sworn admission.  *See United States v. Torres*, 129 F.3d 710, 715 (2d Cir. 1997) ("A defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea.").  In any event, to the extent Blow claims that he may have had a viable suppression issue, the Second Circuit has recognized that "a guilty plea . . . conclusively resolves the question of factual guilt supporting the conviction, thereby rendering any antecedent constitutional violation bearing on factual guilt a non-issue."  *United States v. Gregg*, 463 F.3d 160, 164 (2d Cir. 2006); *see Lebowitz v. United States*, 877 F.2d 207, 210 (2d Cir. 1989) (recognizing that a voluntary guilty plea bars all non-jurisdictional defects in a prior proceeding).  As a result, "at least on collateral attack of a judgment of conviction, . . . a petitioner may not assert pre-plea constitutional violations bearing on the valid establishment of his factual guilt."  *Id*.

and never disputed the quantity during the plea hearing. Blow did not even dispute the

subsequent conclusion of the United States Probation Office, as set out in the PSIR, that

his offense involved between 150 to 500 grams of cocaine base, well over the five-gram

statutory threshold. Although the December 2010 lab results revealed that the quantities

of the controlled purchases were less than five grams, the AUSA's factual proffer went

beyond a description of the four controlled purchases. Regardless of the December 2010

lab results, Blow cannot now dispute the factual basis of the charge to which he fully

admitted at his plea hearing and sentencing. "For the representations of the defendant,

his lawyer, and the prosecutor at such a [plea] hearing, as well as any findings made by

the judge accepting the plea, constitute a formidable barrier in any subsequent collateral

proceedings." *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977). Under these

circumstances, where the plea allocution provides clear factual bases for the plea of guilty

to the offense charged and the defendant admitted to the quantity involved, this barrier is

insurmountable.

Accordingly, I conclude that Blow has failed to demonstrate an inadequate factual

basis for his plea.[13]

---

[13] I note parenthetically that Blow's claim as to the factual inadequacy of his plea is also barred by his failure to raise the issue on direct appeal. *See Rosario v. United States*, 164 F.3d 729, 732 (2d Cir. 1998) ("Where a criminal defendant has procedurally forfeited his claim by failing to raise it on direct review, the claim may be raised in a § 2255 motion only if the defendant can demonstrate either: (1) cause for failing to raise the issue, and prejudice resulting therefrom, or (2) actual innocence." (internal citations and quotations omitted)). Blow received the lab reports on January 4, 2011 (Doc. 69-1), but the Second Circuit did not issue its order until January 21, 2011, *United States v. Blow*, 406 F. App'x 555 (2d Cir. 2011), and the Supreme Court did not deny Blow's petition for a writ of certiorari until October 3, 2011, *Blow v. United States*, 132 S. Ct. 201 (2011). With the lab report in hand, Blow could have sought a remand to the district court to raise the issue, but declined to do so. "A motion under § 2255 is not a substitute for an appeal." *United States v. Munoz*, 143 F.3d 632, 637 (2d Cir. 1998).

## B.    Ineffective Assistance of Counsel

Blow argues that Attorney Mann was constitutionally ineffective in that she: (1) failed to investigate the factual basis for his plea; (2) failed to disclose to the court the dispute regarding Blow's confession and the drug amounts; (3) failed to argue that there was no evidence of an agreement between Blow and Stradford as necessary to establish the existence of a conspiracy; (4) failed to advise Blow of the applicability of the career offender sentencing guideline enhancement; (5) failed to inform Blow of certain stipulated facts; and (6) improperly persuaded Blow to plead guilty rather than proceed to trial.  (Doc. 66-1 at 1-8.)

In her affidavit, Attorney Mann disputes many of the factual representations contained in Blow's Motion.  First, she claims that "Blow was advised early on that he faced a guideline classification as a career offender," and this enhancement "was the topic of many discussions between [Mann] and Mr. Blow."  (Doc. 73 at 1.)  According to Mann, her notes from Blow's April 2009 arraignment reflect that the subject of the career enhancement was discussed with Blow at the time.  (*Id*. at 2.)  Mann has provided copies of letters to Blow corroborating her version of events.  In a June 8, 2009 letter, she advised Blow of the applicability of the career offender enhancement.  (Doc. 73-4.)  A July 22, 2009 letter contains a similar representation.  (Doc. 73-2.)  Attorney Mann's statements are also corroborated by the fact that she stated at Blow's Rule 11 change of plea hearing that "there are some potentials [sic] for career offender classification."  (Doc. 57 at 17.)  Blow responds, saying that Mann never gave him "definite knowledge of whether he was a career offender" until the sentencing hearing.  (Doc. 80 at 8 n.5.)

Attorney Mann was under no obligation to provide Blow with a "definite" assessment of how the sentencing court would apply the guidelines, nor would such an assessment have been possible. Mann forewarned Blow in her June 8, 2009 letter that her calculation of Blow's exposure under the sentencing guidelines was "an estimate only and is not binding in any way upon the Court or the prosecution." (Doc. 73-4 at 1.) Of course, this estimate was accurate insofar as it included the career offender guideline, which the PSIR and the Court ultimately applied.

Second, to the extent Blow alleges that discovery materials were not provided to him in a timely fashion (Doc. 66-2 at 4-6), Attorney Mann states that Blow "was provided with full access to discovery materials when they were received by" her (Doc. 73 at 3). In support, Mann submits a May 4, 2009 letter that she sent to Blow that states: "Enclosed you will find materials received from the government regarding your case." (Doc. 73-3.) Third, Mann notes that throughout her representation of Blow "it was reiterated that the decision whether to proceed to trial or enter a plea was exclusively his own." (Doc. 73 at 3; *see id*. at 4("Blow made the decision not to pursue a trial.").) Mann claims to have had "lengthy discussions" with Blow regarding "what would likely occur at a trial," and to have spent "[a] considerable amount of time . . . reviewing the recordings that were a part of the discovery materials provided by the government." (Doc. 73 at 3.)[14] Ultimately, it was Blow's decision alone "not to pursue a trial." (*Id*. at

---

[14] Mann's statement that she had spent a "considerable amount of time" has been at least implicitly corroborated by Blow. At the change of plea hearing, Blow affirmed that he had an opportunity to review Count One with Mann and that she had explained the nature and elements of the offense, together with any defenses he might have to the charge. (Doc. 57 at 6.)

4.)  Finally, in response to Blow's argument concerning her failure to disclose certain stipulated facts to him, Mann notes that "[t]here was no stipulation as to the facts of the case," and that "Blow admitted at the change of plea hearing that he conspired to distribute five grams or more of cocaine base."  (*Id*.)

When confronted with conflicting factual assertions from a defendant and his allegedly-ineffective counsel, it is within the court's discretion whose facts to credit.  *See Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) ("The court . . . determines whether, viewing the evidentiary proffers, where credible, and record in the light most favorable to the petitioner, the petitioner, who has the burden, may be able to establish at a hearing a prima facie case for relief.").  In making this decision, "a district court need not assume the credibility of [a petitioner's] factual assertions . . . where the assertions are contradicted by the record in the underlying proceeding."  *Id*. at 214.  The district courts within this circuit have repeatedly credited the detailed factual assertions of counsel where buttressed by documentary and evidentiary support and contradicted only by the petitioner's self-serving, vague, and conclusory statements.  *See Coleman*, 2013 WL 708119, at *7 (collecting cases).

Consistent with this line of cases, I credit Attorney Mann's version of events over Blow's.  In support of his description of Mann's deficiencies, Blow has relied solely on conclusory allegations in his Motion.  No "objective evidence" exists in the record to support these allegations.  *Cf. Puglisi*, 586 F.3d at 216 (habeas petitioner's claim may merit hearing where it is accompanied by "objective evidence" in the record).  Indeed, as detailed above, the record is replete with Blow's *own contrary statements*—particularly

the plea hearing (Doc. 57 at 6) and plea agreement (Doc. 30 at 6)—in which he reaffirmed his satisfaction with Mann's performance. In contrast, Mann has provided a detailed affidavit rebutting Blow's allegations, along with contemporaneous documentary support. Blow's unsupported factual assertions are contradicted by Mann's affidavit and accompanying evidence.

Even assuming *arguendo* that the sequence of events transpired as Blow describes, a petitioner raising a Sixth Amendment challenge to the performance of counsel must meet a heavy burden. He must establish both that (1) counsel's performance was so unreasonable under prevailing professional norms that she "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and (2) counsel's ineffectiveness prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id*. at 694. *Accord United States v. Gordon*, 156 F.3d 376, 379 (2d Cir. 1998).

As to the first prong, an attorney's representation is deficient when it falls "below an objective standard of reasonableness," as determined by reference to "prevailing professional norms." *Strickland*, 466 U.S. at 688. However, "constitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). The performance inquiry examines the reasonableness of counsel's actions under all circumstances,

keeping in mind that a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Id*. (quoting *Rompilla v. Beard*, 545 U.S. 374, 408 (2005)).

This presumption of reasonableness and deference to counsel apply to the investigative decisions of counsel as well. As stated by the Supreme Court, counsel's decisions regarding whether to conduct further investigation are, like the rest of counsel's actions, judged against the standard of the applicable "prevailing professional norms." *See Wiggins v. Smith*, 539 U.S. 510, 523 (2003). "A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision," *DeLuca v. Lord*, 77 F.3d 578, 588 n.3 (2d Cir. 1996), and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *id*. at 588 (citing *Strickland*, 466 U.S. at 690). Moreover, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*.; *see Rompilla*, 545 U.S. at 383 ("reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste").

Turning to the second *Strickland* prong, counsel's performance is prejudicial when it is so poor as to "undermine confidence in the outcome" of the proceedings such that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (internal quotation marks omitted). "Unlike the determination of trial counsel's performance

under the first prong of *Strickland*, the determination of prejudice 'may be made with the benefit of hindsight.'" *Hemstreet v. Greiner*, 491 F.3d 84, 91 (2d Cir. 2007) (quoting *Mayo v. Henderson*, 13 F.3d 528, 534 (2d Cir. 1994)).

There was no deficiency in Attorney Mann's performance during plea negotiations and sentencing. As outlined above, the evidence against Blow—including his admission to 40 previous drug sales, four controlled purchases, and the contraband found on his co-conspirator—was overwhelming. Faced with this evidence, Attorney Mann reasonably concluded that any additional investigation as to the quantity of drugs involved in the conspiracy would have been futile, and thus she began plea negotiations. *See United States v. Morel*, Nos. 07 Cr. 4899, 09 Civ. 8922, 2010 WL 2900318, at *4 (S.D.N.Y. July 22, 2010) ("The appropriateness of pursuing a plea agreement with the government is a strategic decision ordinarily not second-guessed by the court."). In the plea agreement, Attorney Mann secured the dismissal of five of the six charges against Blow, as well as the government's recommendation that Blow receive credit for acceptance of responsibility under the USSG. (Doc. 30 at 2-3.)

At some point during negotiations, Mann also secured the government's assent not to make a filing pursuant to 21 U.S.C. § 851 regarding Blow's prior felony drug offense conviction, which would have doubled the applicable mandatory minimum from five to ten years. *See* 21 U.S.C. § 841(b)(1)(B) (note that the statute has since been amended to increase the cocaine base quantity threshold from five to twenty-eight grams as described *supra* n.3). Of course, there is no telling what impact such a filing would have had on the sentencing court's determination of an appropriate sentence, particularly considering that

Judge Sessions ultimately sentenced Blow to a term of imprisonment in excess of even the mandatory minimum, but it is certainly demonstrative of Mann's work on Blow's behalf. Also, the government's decision not to make a § 851 filing lowered the guideline calculation of Blow's total offense level, as it altered the applicable maximum penalty (from life to 40 years' imprisonment), which, in turn, lowered the pre-mitigation offense level from thirty-seven to thirty-four (and, after applying the adjustment for Blow's acceptance of responsibility, from thirty-four to thirty-one). *See* USSG §4B1.1(b). This likely did have a direct impact on the sentence imposed, as it lowered the PSIR guideline calculation considerably, from a range of 262 to 327 months to the range of 188 to 235 months.

There is no evidence demonstrating that Mann could have secured a better deal, and, in any event, this argument is not cognizable under *Strickland*. *See Lake v. United States*, 465 F. App'x 33, 35 (2d Cir. 2012) (summary order) (allegations concerning counsel's "miscalculations regarding the Government's willingness to negotiate a more favorable deal . . . represent, at best, strategic errors that are virtually unchallengeable" (quotation omitted)).

At sentencing, Mann engaged in vigorous advocacy, arguing for both a downward departure from the sentencing guidelines and a variance based upon the factors at 18 U.S.C. § 3553(a). In doing so, she raised a litany of mitigating factors, strenuously contesting various aspects of the guidelines calculation present in the PSIR and relied upon in the government's recommendation. In crafting the sentence, Judge Sessions accepted many of Mann's arguments, resulting in a considerable sentencing benefit to

Blow. Specifically, on the basis of the mitigating factors cited by Mann, Judge Sessions deviated from the PSIR's guideline calculation and the government's recommendation of a minimum guideline sentence of 188 months, and instead imposed a sentence of only 130 months, thereby imposing a sentence four years and ten months below the applicable guideline range calculated by the United States Probation Office and recommended by the government. Mann's representation of Blow was quite effective.

Accordingly, I find that Blow has failed to satisfy his burden of demonstrating that his counsel was constitutionally ineffective.

## Conclusion

For the reasons set forth above, I recommend that Blow's Motion under 28 U.S.C. § 2255 (Doc. 66) be DENIED.

Dated at Burlington, in the District of Vermont, this 3rd day of April, 2013.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).